ROBBINS GELLER RUDMAN
 & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
    – and –
SAMUEL H. RUDMAN
MARY K. BLASY (211262)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHAN DYE, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| GOPRO, INC., NICHOLAS D. WOODMAN and BRIAN T. McGEE, | |
| Defendants. | |
| | DEMAND FOR JURY TRIAL |

1  Plaintiff Nathan Dye, individually and on behalf of all others similarly situated, by plaintiff's

2  undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon

3  personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all

4  other matters based on the investigation conducted by and through plaintiff's attorneys, which

5  included, among other things, a review of Securities and Exchange Commission ("SEC") filings by

6  GoPro, Inc. ("GoPro" or the "Company"), as well as media and analyst reports about the Company

7  and conference call transcripts.  Plaintiff believes that substantial additional evidentiary support will

8  exist for the allegations set forth herein after a reasonable opportunity for discovery.

9  **NATURE OF THE ACTION**

10  1.  This is a securities class action on behalf of all purchasers of the common stock of

11  GoPro between August 4, 2017 and January 5, 2018, inclusive (the "Class Period"), seeking

12  remedies pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

13  Defendants include GoPro and certain of its senior executive officers.

14  2.  GoPro develops and sells mountable and wearable cameras and accessories.  Its

15  primary product offerings include: ***HERO5/HERO6***, a line of cloud-connected cameras; ***GoPro***

16  ***Plus***, a cloud-based storage solution that enables subscribers to access, edit and share content; ***Quik***,

17  a desktop app that provides expanded editing options for power users; ***Capture***, a mobile app that

18  allows users to preview and play back shots, control their GoPro cameras, and share content on the

19  move using their smartphones; ***Karma***, a compact, foldable drone and versatile stabilization solution;

20  and ***Karma Grip***, a handheld and body-mountable camera stabilizer to capture zero-shake and

21  smooth video.  GoPro markets and sells its products primarily through retailers and distributors, as

22  well as through its website.

23  3.  After making bullish statements about the Company's purported then-present strong

24  business metrics and financial prospects after the close of trading on August 3, 2017, including that

25  GoPro was "'building momentum,'" experiencing "'[s]trong demand'" and "'continu[ing] to track

26  toward [its] goal of full-year, non-GAAP profitability in 2017,'" and then ratchetting up GoPro's

27  third quarter 2017 ("3Q17") financial guidance on September 7, 2017 by emphasizing that

28  "'[c]onsumer demand for GoPro products [remained] strong'" and claiming that its "'[c]hannel

inventories ha[d] been reduced,'" ostensibly facilitating even more sell-through of GoPro product through retailers during the all-important 2017 holiday season, several of GoPro's senior executives cashed in with unusually timed stock sales.  The executives who sold shares included GoPro's Chief Executive Officer ("CEO") Nicholas D. Woodman ("Woodman"), who sold more than 700,000 shares of his personally held stock for gross proceeds of more than $6.5 million, and its Chief Financial Officer ("CFO") Brian T. McGee ("McGee"), who sold more than 7,500 shares of his personally held stock for gross proceeds of more than $62,000.  Indeed, the timing of these stock sales was so unusual that defendant Woodman sent an email to GoPro's employees – which he also conveniently provided to the SEC in order to mollify investors – stating in pertinent part as follows:



Hey GoPro,

I want to brief you on a personal matter: my 10b5-1 stock sales plan has started selling some of my shares and it's likely that this will generate some speculation in the media.  I want to make sure that you all get the facts directly from me.

**What's Going On?**  My 10b5-1 stock plan was set up a while ago to automatically sell shares for me when certain criteria are met.  ***It's now kicking in for the first time***.

**Why Sell?**  *I haven't sold any stock for the past three years*.  Both common sense and my financial advisors tell me that I need to diversify some of my ownership in GoPro into other things.  I've put this off for a very long time but I have to acknowledge it's not very smart of me to have so many eggs in one basket.

My 10b5-1 plan is entirely financial and has nothing to do with my excitement for our future.  ***As those of you who work directly with me know, I literally cannot wait for all the new products and advancements we've got lined up for 2018 and beyond.  We're the best team we've ever been, we're putting out our best products ever and I only see this being more the case moving forward.  I'm so excited for our future 'cause we're going to rock it***!!!!

Thanks for understanding and, if there is any public reaction to the sales, I apologize for this distraction!

Hi5 - Nick

4.     However, on Monday January 8, 2018, before the open of trading, GoPro disclosed that for its fourth quarter 2017 ("4Q17"), the quarter completing the all-important 2017 holiday

1  selling season where analysts had been led to believe GoPro would report sales exceeding $470

2  million, GoPro had achieved sales of just $340 million.  GoPro blamed the results on the slashing of

3  prices for its HERO6 Black, HERO5 Black and HERO5 Session cameras, as well as its Karma

4  drone, during the quarter, which the Company had been forced to engage in to move inventory and

5  which had a negative $80 million impact on revenues.  GoPro also disclosed it was cutting more than

6  one-fifth of its workforce and exiting the drone market altogether, requiring it to dump the rest of its

7  Karma drone inventory.  GoPro had cut the price for its HERO5 Black camera in December 2017,

8  and announced it was now reducing the price of its newly launched HERO6 model to $399 from

9  $499.  The workforce reduction would cost GoPro $33 million, mainly in severance costs.  While

10  GoPro stated that defendant Woodman's cash-based compensation was being cut to $1 from an

11  annual base salary of $800,000, this represented a small pittance compared to the more than $6.5

12  million Woodman had just received from selling his GoPro shares at fraud-inflated prices.

13       5.       On this news, the price of GoPro stock declined, falling from a close of $7.52 per

14  share on January 5, 2018, to trade as low as $5.04 per share in intraday trading on January 8, 2018,

15  before closing at $6.56 per share on unusually high trading volume of more than 59 million shares

16  traded.

17                          **JURISDICTION AND VENUE**

18       6.       The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15

19  U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

20  Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

21       7.       Venue is proper in this district pursuant to §27 of the Exchange Act.  Acts and

22  transactions giving rise to the violations of law complained of herein occurred in this district.

23                              **THE PARTIES**

24       8.       Plaintiff Nathan Dye purchased GoPro common stock during the Class Period as

25  described in the Certification attached hereto and incorporated herein by reference and suffered

26  damages thereon.

27       9.       Defendant GoPro, headquartered in San Mateo, California, develops and sells

28  mountable and wearable cameras and accessories sold in the United States and internationally.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 3 -

1  During the Class Period, GoPro had more than 109 million shares of its Class A common stock

2  issued and outstanding, which shares traded in an efficient market on the NASDAQ under the ticker

3  symbol "GPRO."  GoPro was followed by scores of stock analysts and stock rating agencies and was

4  constantly in communication with the markets and investors in quarterly conference calls and

5  frequent presentations at investor and analyst conferences.  GoPro also filed periodic public reports

6  with the SEC and regularly issued press releases to the financial press.

7         10.     Defendant Woodman founded GoPro and served as its CEO throughout the Class

8  Period.

9         11.     Defendant McGee served as GoPro's CFO throughout the Class Period.

10         12.     Defendants Woodman and McGee are sometimes referred to herein as the "Individual

11  Defendants."

12         13.     During the Class Period, the Individual Defendants ran GoPro as "hands-on"

13  managers overseeing GoPro's operations and finances and made the materially false and misleading

14  statements described herein.  The Individual Defendants were intimately knowledgeable about all

15  aspects of GoPro's financial and business operations, as they received daily reports and had access to

16  computerized information regarding sales, costs and expenses, product demand and inventory

17  management.  They were also intimately involved in deciding which disclosures would be made by

18  GoPro.  The Individual Defendants made various public statements for GoPro during the Class

19  Period and participated in Class Period investor conferences.

20  **BACKGROUND TO THE CLASS PERIOD**

21         14.     Defendant GoPro was founded in 2002 by defendant Woodman.  It manufactures

22  eponymous action cameras and develops its own mobile apps and video-editing software.  Founded

23  as Woodman Labs, Inc., the Company eventually focused on the connected sports genre, developing

24  its line of action cameras and, later, video editing software.

25         15.     GoPro also developed and launched a quadcopter drone, Karma, released in October

26  2016.  GoPro had to recall the Karma drone in November 2016 following reports that a defective

27  battery compartment door caused the drones to lose power and drop out of the sky.

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS      - 4 -

1      16.     Nonetheless, defendant Woodman told *TechCrunch* in January 2017 that the

2   Company was returning to profitability, banking on sales of its new HERO5 camera, and that

3   because GoPro's brand was so ***strong***, it was not only going to continue selling the relaunched

4   Karma drone, but was going to expand its line of drones.

5      17.     In May 2017, following the Company's issuance of its fiscal 2016 annual report on

6   Form 10-K, the SEC directed the Company to make more fulsome disclosures about "known trends

7   and uncertainties" impacting its business as required by SEC Rule SK-303, with GoPro pledging to

8   do so, stating in pertinent part as follows:

> [SEC:]  1.  ***We note that there have been significant increases in your research and development expenses in recent periods, and that you expect this trend to continue in 2017.  Please revise your MD&A to disclose any known trends or uncertainties with respect to your research and development expenses, and discuss if known the anticipated drivers therefor.  For example, it appears that certain of your R&D expenditures have related to the resolution of issues related to Karma.***

> [GoPro:]  We respectfully advise the Staff that we considered known trends and uncertainties with respect to our operating expenses (including research and development expenses) in preparing MD&A disclosures in the Form 10-K and believe we have adequately addressed such trends and uncertainties.  By way of background, the Form 10-K includes the following disclosure pertaining to known trends and uncertainties, and the anticipated drivers therefor, regarding our anticipated operating expenses as well as the focus of our research and development spending . . . .

*     *     *

> ***We advise the Staff that we intend to continue to review and consider our disclosures regarding known trends and uncertainties in future filings, and include appropriate discussion in MD&A accordingly*** . . . .

**DEFENDANTS' FALSE AND MISLEADING
CLASS PERIOD STATEMENTS**

18.     The Class Period starts on August 4, 2017.  On August 3, 2017, after the close of trading, GoPro issued a press release announcing its second quarter 2017 ("2Q17") financial results for the period ended June 30, 2017, and providing 3Q17 and fiscal 2017 financial guidance.  In addition to reporting 2Q17 revenues of "$297 million, up 34% year-over-year and 36% quarter-over-quarter," the release emphasized that "***[s]harp focus on inventory and channel management resulted in a 39% reduction in inventory quarter-over-quarter***" so that "forward weeks of supply in the channel [were] down 25%," with "[b]oth position[ing] [GoPro] well for upcoming product

launches."  In addition, the release stated that "*[g]lobal sell-thru of cameras increased 18% sequentially*" and "*camera sell-thru above $300 was up 13% year-over-year*," and that "*HERO5 Black was the best-selling digital image camera* in the U.S. in the second quarter, according to The NPD Group's Retail Tracking Service."  The release quoted defendant Woodman, who emphasized that GoPro was "'building momentum'" and was continuing to experience "'[s]trong demand'" such that, with "'HERO6 and Fusion, [its] 5.2K spherical camera . . . on course to launch later this year,'" GoPro "'continue[d] to track toward [its] goal of full-year, non-GAAP profitability in 2017.'"  The release also provided strong 3Q17 and fiscal 2017 financial guidance, stating in pertinent part as follows:

- Third Quarter 2017

  - Revenue of $300 million +/- $10 million

  - GAAP and non-GAAP gross margin to be 37% +/- 1%

  - GAAP operating expenses of between $131 million and $133 million

  - Non-GAAP operating expenses of between $115 million and $117 million

  - GAAP EPS to be $(0.24) +/- $0.05

  - Non-GAAP EPS to be $(0.06) +/- $0.05

- 2017

  - GAAP operating expenses below $570 million

  - Non-GAAP operating expenses below $495 million

19.     Defendants conducted a conference call with investors and stock analysts later that evening, providing additional positive commentary about the Company's then-present business metrics and financial prospects.

20.     On August 3, 2017, GoPro filed its 2Q17 quarterly report on Form 10-Q ("2Q17 10-Q") with the SEC in which it purported to fully disclose to investors any "known trends and uncertainties" then affecting its business, as the Company had promised in May 2017 to do going forward.  According to the 2Q17 10-Q, the Company then expected 4Q17 sales to be larger than 2Q17 and 3Q17 sales, stating in pertinent part as follows:

*Seasonality.* Historically, we have experienced the highest levels of revenue in the fourth quarter of the year, coinciding with the holiday shopping season, particularly in the United States and Europe.

21. Elsewhere in the 2Q17 10-Q GoPro reiterated that "seasonal consumer shopping patterns significantly affect [its] business," and that it had "traditionally experienced greater revenues in the fourth quarter of each year due to demand related to the holiday season, and in some years, including 2016, the launch of new products heading into the holiday season," such that "[f]ourth quarter revenue comprised [a full] 46%, 27% and 45% of [its] 2016, 2015 and 2014 revenue, respectively." Defendants stated that GoPro then "anticipate[d] that this seasonal impact [was] likely to continue."

22. The 2Q17 10-Q was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by defendants Woodman and McGee.

23. On September 7, 2017, GoPro issued a press release stating that the Company was then experiencing "strong consumer demand for the brand," and with channel inventories of dated product, *i.e.*, HERO5 cameras, "reduced," the upcoming launch of HERO6 and Fusion, the 5.2K spherical camera, was expected to be even more profitable, justifying an increase in GoPro's 3Q17 financial guidance. The release stated in pertinent part as follows:

GoPro Expects Third-Quarter 2017 Revenue and Gross Margin Will Be at the High-End of Guidance

Seeing Strong Consumer Demand for the Brand

HERO6 and Fusion Cameras are Tracking for launch in 2017

. . . GoPro, Inc, (NASDAQ: GPRO) today announced revenue and gross margin for the third quarter of 2017 are both expected to be at the high end of their previously announced respective ranges of between $290-$310 million and 36-38 percent. GoPro also forecasts the third quarter to be profitable on a non-GAAP basis, though not profitable on a GAAP basis.

"Consumer demand for GoPro products is strong," said GoPro Chief Operating Officer CJ Prober. "Channel inventories have been reduced and we're incredibly excited about the upcoming launch of two great new products, HERO6 and our 5.2K spherical camera, Fusion."

24. On November 1, 2017, GoPro issued a press release announcing its 3Q17 financial results and providing 4Q17 and updated fiscal 2017 guidance. In addition to reporting that 3Q17 "[r]evenue was $330 million, up 37% year-over-year," the release announced that GoPro had

reached profitability in 3Q17, reporting that "*GAAP net income for the third quarter was approximately $15 million, or $0.10 per share* – a sharp improvement over a GAAP net loss of $104 million in the third quarter of 2016."  The release also highlighted that "*[a]verage sales price (ASP) increased by 22% year-over-year and 3% sequentially* . . . driven by the strong performance of the premium-priced HERO6," that "*HERO6 Black launched on September 28* . . . with strong sales execution and a 93% channel fill rate at retail," that "*[p]rior to the HERO6 launch, HERO5 Black was the best-selling digital image camera in the U.S. for four straight quarters* – holding that chart position since its launch in 2016, according to The NPD Group's Retail Tracking Service," and that "*GoPro's drone, Karma, was the #2 selling drone* in the U.S. *priced $1,000 and above* during the six months ending September 2017, according to the NPD Group's Retail Tracking Service."  The release also quoted defendant Woodman as lauding the Company's purportedly ongoing strong business metrics and financial prospects – and return to profitability – stating in pertinent part as follows:

> "*GoPro has turned a corner, restoring growth and profitability to our business* . . . .  We are dedicated to growing as an innovative company, while being a vigilant steward of shareholder capital."

> "During the quarter we generated $47 million in cash and gross margins were 40 percent. Year-over-year, we grew revenue by 37 percent and dramatically reduced operating costs without impacting our product roadmap. We launched our premium-priced HERO6 Black *with global on-shelf availability and strong critical acclaim. We are now focused on driving consumer demand to reach our goal of full-year double-digit revenue growth and non-GAAP profitability*."

25.     The release also provided the following 4Q17 and updated fiscal 2017 financial guidance, purportedly justified by the Company's then-current business metrics and financial prospects:

- Fourth Quarter 2017

  - *Revenue of $470 million +/- $10 million*

  - GAAP and Non-GAAP gross margin of 41.5% +/- 50 basis points

  - GAAP operating expenses of $149 million +/- $1 million

  - Non-GAAP operating expenses of $130 million +/- $1 million

  - GAAP EPS to be between $0.25 and $0.35

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                    - 8 -

- Non-GAAP EPS to be between $0.37 and $0.47
- Full Year 2017
  - ***Revenue of $1.315 billion +/- $10 million***
  - GAAP operating expenses below $570 million
  - Non-GAAP operating expenses below $490 million
  - GAAP EPS to be between $(0.65) and $(0.55)
  - Non-GAAP EPS to be between $(0.02) to $0.08

26.   Defendants conducted a conference call with investors and stock analysts later that evening, providing additional positive commentary about the Company's then-present business metrics and financial prospects.

27.   On November 3, 2017, GoPro filed its 3Q17 quarterly report on Form 10-Q ("3Q17 10-Q") with the SEC in which it purported to fully disclose to investors any "known trends and uncertainties" affecting its business as required by SEC Rule SK-303 and as the Company had promised in May 2017 to do going forward.  According to the 3Q17 10-Q, the Company still expected 4Q17 sales to be larger than 2Q17 and 3Q17 sales, stating in pertinent part as follows:

> ***Seasonality.***  Historically, we have experienced the highest levels of revenue in the fourth quarter of the year, coinciding with the holiday shopping season, particularly in the United States and Europe.

28.   Elsewhere the 3Q17 10-Q reiterated that GoPro had "traditionally experienced greater revenues in the fourth quarter of each year due to demand related to the holiday season, and in some years, including 2016, the launch of new products heading into the holiday season," noting that "[f]ourth quarter revenue comprised 46%, 27% and 45% of [its] 2016, 2015 and 2014 revenue, respectively" – so always more than 25% of annual revenues and sometimes nearly 50%.  GoPro further stated that it "anticipate[d] that this seasonal impact [was] likely to continue."

29.   The 3Q17 10-Q was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by defendants Woodman and McGee.

30.   The price of GoPro common stock increased on defendants' false and misleading Class Period statements, reaching an intraday Class Period high of $11.89 per share on September

27, 2017.  Several of GoPro's senior executives cashed in with unusually timed stock sales, including defendant Woodman, who sold 706,980 of his personally held GoPro shares between November 3, 2017 and November 7, 2017 at between $9.00 and $9.30 per share, reaping $6,520,627 in gross proceeds, and defendant McGee, who sold 7,541 of his personally held GoPro shares on November 16, 2017 at $8.23 per share, reaping $62,062 in gross proceeds.  Indeed, the timing of these stock sales was so unusual that defendant Woodman sent an email to GoPro's employees – which he also conveniently provided to the SEC in order to mollify investors – which stated in pertinent part as follows:



Hey GoPro,

I want to brief you on a personal matter: my 10b5-1 stock sales plan has started selling some of my shares and it's likely that this will generate some speculation in the media.  I want to make sure that you all get the facts directly from me.

**What's Going On?**  My 10b5-1 stock plan was set up a while ago to automatically sell shares for me when certain criteria are met.  ***It's now kicking in for the first time***.

**Why Sell?**  ***I haven't sold any stock for the past three years***.  Both common sense and my financial advisors tell me that I need to diversify some of my ownership in GoPro into other things.  I've put this off for a very long time but I have to acknowledge it's not very smart of me to have so many eggs in one basket.

My 10b5-1 plan is entirely financial and has nothing to do with my excitement for our future.  ***As those of you who work directly with me know, I literally cannot wait for all the new products and advancements we've got lined up for 2018 and beyond.  We're the best team we've ever been, we're putting out our best products ever and I only see this being more the case moving forward.  I'm so excited for our future 'cause we're going to rock it***!!!!

Thanks for understanding and, if there is any public reaction to the sales, I apologize for this distraction!

Hi5 - Nick

31.    The statements referenced above in ¶¶18-30 were each materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts known by defendants during the Class Period:

1   (a)   Demand for the GoPro brand had dramatically declined and retailers were not

2   stocking up for 2017 holiday sales to the extent GoPro had budgeted for;

3   (b)   Demand for GoPro's Karma drones was so weak that the Company could no

4   longer afford to manufacture and sell them profitably;

5   (c)   The Company would be forced to dramatically slash prices on its newly

6   launched HERO6 Black and its dated HERO5 Black and HERO5 Session cameras, as well as its

7   Karma drone, during the quarter and would need to further slash HERO6 prices in January 2018; and

8   (d)   As a result of the foregoing, GoPro was not on track to achieve the financial

9   results it had led the market to believe it was on track to achieve during the Class Period.

10   32.   On Monday January 8, 2018, before the open of trading, GoPro reported financial

11   results for its 4Q17 – the quarter that included GoPro's all-important 2017 holiday selling season,

12   where it had forecast sales of $470 million and analysts had been led to believe GoPro would report

13   sales exceeding $472 million based on defendants' bullish Class Period statements.  GoPro reported

14   sales of just $340 million.  GoPro blamed the results on the slashing of prices for its HERO6 Black,

15   HERO5 Black and HERO5 Session cameras, as well as its Karma drone, during the quarter, which

16   the Company had been forced to engage in to move inventory and which had a negative $80 million

17   impact on revenues.  GoPro also disclosed it was cutting more than one-fifth of its workforce,

18   exiting the drone market altogether, which required it to dump its remaining Karma drone inventory,

19   and reducing the price of its new HERO6 model to $399 from $499.  The workforce reduction would

20   cost GoPro $33 million, mainly in severance costs.  While GoPro stated that defendant Woodman's

21   cash-based compensation was being cut to $1 from an annual base salary of $800,000, that was a

22   small pittance compared to the more than $6.5 million in proceeds Woodman had received from

23   selling his GoPro shares at fraud-inflated prices during November 2017, well into the 2017 holiday

24   season.

25   33.   On this news, the price of GoPro stock declined, falling from a close of $7.52 per

26   share on January 5, 2018, to trade as low as $5.04 per share in intraday trading on January 8, 2018,

27   before closing at $6.56 per share on unusually high trading volume of more than 59 million shares

28   traded.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - 11 -

**NO SAFE HARBOR**

34.     GoPro's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

35.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of GoPro who knew that the FLS was false.  In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

**ADDITIONAL SCIENTER ALLEGATIONS**

36.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding GoPro, their control over, and/or receipt or modification of GoPro's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning GoPro, participated in the fraudulent scheme alleged herein.

1

2

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

3

37.     At all relevant times, the market for GoPro's common stock was an efficient market

4

for the following reasons, among others:

5

(a)     GoPro's stock met the requirements for listing, and was listed and actively

6

traded on the NASDAQ, a highly efficient and automated market;

7

(b)     The Company has 109 million Class A shares issued and outstanding, and

8

during the Class Period, on average, millions of shares of GoPro stock were traded on a daily basis,

9

demonstrating a very active and broad market for GoPro stock and permitting a very strong

10

presumption of an efficient market;

11

(c)     as a regulated issuer, GoPro filed periodic public reports with the SEC;

12

(d)     GoPro regularly communicated with public investors via established market

13

communication mechanisms, including the regular dissemination of press releases on national

14

circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as

15

communications with the financial press and other similar reporting services;

16

(e)     GoPro was followed by many securities analysts who wrote reports that were

17

distributed to the sales force and certain customers of their respective firms during the Class Period

18

and each of these reports was publicly available and entered the public marketplace; and

19

(f)     numerous National Association of Securities Dealers ("NASD") member

20

firms were active market-makers in GoPro stock at all times during the Class Period.

21

38.     As a result of the foregoing, the market for GoPro common stock promptly digested

22

current information regarding GoPro from publicly available sources and reflected such information

23

in GoPro's stock price.  Under these circumstances, all purchasers of GoPro common stock during

24

the Class Period suffered similar injury through their purchases of GoPro common stock at

25

artificially inflated prices, and a presumption of reliance applies.

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                    - 13

**LOSS CAUSATION**

39.     During the Class Period, as detailed herein, defendants made false and misleading statements and/or omitted material information concerning GoPro's business fundamentals and financial prospects and engaged in a scheme to deceive the market.

40.     By artificially inflating and manipulating GoPro's stock price, defendants deceived plaintiff and the Class (as defined below) and caused them losses when the truth was revealed. When defendants' prior misrepresentations and fraudulent conduct became apparent to the market, as detailed above, it caused GoPro's stock price to fall precipitously as the prior artificial inflation came out of the stock price.  As a result of their purchases of GoPro common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**CLASS ACTION ALLEGATIONS**

41.     This is a class action on behalf of all purchasers of GoPro common stock during the Class Period (the "Class").  Excluded from the Class are the defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest.  Class members are so numerous that joinder is impracticable.

42.     Common questions of law and fact predominate and include: (a) whether defendants violated the Exchange Act; (b) whether defendants omitted and/or misrepresented material facts; (c) whether defendants knew or recklessly disregarded that their statements were false; (d) whether defendants artificially inflated the price of GoPro common stock; and (e) the extent and appropriate measure of damages.

43.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT I**

**For Violation of §10(b) of the Exchange Act
and Rule 10b-5 Against All Defendants**

44.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

45.     Throughout the Class Period, defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of GoPro common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

46.     During the Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period, did: (a) artificially inflate and maintain the market price of GoPro common stock; (b) deceive the investing public, including plaintiff and other Class members, as alleged herein; (c) cause plaintiff and other members of the Class to purchase GoPro common stock at inflated prices; and (d) cause plaintiff and other members of the Class losses when the truth was revealed.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

47.     In addition to the duties of full disclosure imposed on defendants as a result of their affirmative false and misleading statements to the investing public, defendants had a duty to promptly disseminate truthful information with respect to GoPro's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's stock would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

48.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

49.     As a result of the dissemination of materially false and misleading information and failure to disclose material facts as set forth above, the market price of GoPro common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of GoPro common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by defendants, or upon the integrity of the market in which the shares traded, plaintiff and other members of the Class purchased GoPro stock during the Class Period at artificially inflated prices and, when the truth was revealed, were damaged thereby.

50.     Had plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by defendants, plaintiff and the other members of the Class would not have purchased their GoPro stock during the Class Period, or if they had purchased such stock during the Class Period, they would not have done so at the artificially inflated prices they paid.

51.     By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10-5, promulgated thereunder.

**COUNT II**

**For Violation of §20(a) of the Exchange Act**
**Against the All Defendants**

52.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

53.     The Individual Defendants had control over GoPro and made the materially false and misleading statements and omissions on behalf of GoPro within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their shareholder status, executive positions, board membership, and stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends

1  were false and misleading.  The Individual Defendants were provided with or had unlimited access

2  to the Company's internal reports, press releases, public filings and other statements alleged by

3  plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to

4  prevent the issuance of the statements or cause them to be corrected.

5      54.    In particular, the Individual Defendants had direct involvement in and responsibility

6  over the day-to-day operations of the Company and, therefore, are presumed to have had the power

7  to control or influence the particular transactions giving rise to the securities violations as alleged

8  herein.  GoPro, in turn, controlled the Individual Defendants and all of its employees.

9      55.    By reason of such wrongful conduct, defendants are liable pursuant to §20(a) of the

10  Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and the

11  other members of the Class suffered damages in connection with their purchases of the Company's

12  common stock during the Class Period.

13                                    **PRAYER FOR RELIEF**

14      WHEREFORE, plaintiff, on behalf of the Class, prays for judgment as follows:

15      A.    Determining that this action is a proper class action, designating plaintiff as Lead

16  Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil

17  Procedure and plaintiff's counsel as Lead Counsel;

18      B.    Awarding compensatory damages in favor of plaintiff and the other Class members

19  against all defendants, jointly and severally, for all damages sustained as a result of defendants'

20  wrongdoing, in an amount to be proven at trial, including interest thereon;

21      C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

22  action, including counsel fees and expert fees; and

23      D.    Awarding such other and further relief as the Court may deem just and proper.

24

25

26

27

28

1

**JURY DEMAND**

2

Plaintiff demands a trial by jury.

3

DATED:  January 11, 2018

ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS

4

5

6

*s/ Shawn A. Williams*
SHAWN A. WILLIAMS

7

8

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

9

10

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

11

12

13

14

15

JOHNSON FISTEL LLP
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: 619/230-0063
619/255-1856 (fax)

16

17

18

Attorneys for Plaintiff

19

20

I:\Admin\CptDraft\Securities\CPT GoPro 18.docx

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- 18 -

DocuSign Envelope ID: E687D766-DE2F-49A9-9F5399869CD00F5B

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Nathan Dye, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint with my counsel and authorize its filing.

2.      I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 11/06/2017      1,000 | 8.88 | |
| 12/27/2017      3,000 | 7.71 | |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 01/08/2018 | 4,000 | 5.45 |

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.     I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of January, 2018.

DocuSigned by:

*Nathan Dye*

BF365E41EE834EB...

Nathan Dye